**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CASE NO.

JOSEPH L. SANTILLI

    Plaintiff

    V.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY and GROUP
LONG TERM DISABILITY PLAN FOR
EMPLOYEES OF ORACLE AMERICA, INC.

    Defendants

**COMPLAINT**

## INTRODUCTION

This is an action arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, *et. seq.,* to recover benefits due under an employee benefit plan, to clarify the rights of plaintiff to future benefits under such plan, and to recover attorney fees and costs. This is the second suit plaintiff has filed against the same defendants.

On January 14, 2022, plaintiff Joseph L. Santilli filed suit in this court in a matter stylized as *Santilli v. Hartford Life and Accident Insurance Company Group Long Term Disability Plan for employees of ORACLE AMERICA, INC.*, Case No. 22-cv-10060-PBS. The case was resolved by a stipulation remanding the matter to the defendants.

On remand, defendants chose to pay long-term disability benefits to plaintiff Joseph L. Santilli with an effective date of October 14, 2019 through April 30, 2022, and then stopped contending he did not meet the any occupation definition of disability in the long-term disability plan. After multiple appeals by plaintiff Joseph L. Santilli regarding the monthly payment due to him and contesting the termination date of April 30, 2022, Mr. Santilli exhausted all mandatory presuit appeals. This suit is now ripe for judicial adjudication. This suit is an example of abuses where "the insurance industry found it could largely immunize itself from suit due to the Employee Retirement Income Security Act

1

("ERISA")." *United States v. Aegerion Pharmaceuticals, Inc.*, 280 F.Supp.3d 217, 226 (D. Mass. 2017).

## PARTIES

1.      Plaintiff is Joseph L. Santilli ("Santilli") an individual having a usual place of residence at Weymouth, Norfolk County, Massachusetts.

2.      Defendant is Hartford Life and Accident Insurance Company ("Hartford") a stock insurance company having a usual place of business at One Hartford Plaza, Hartford, Connecticut. Hartford may engage in the business of insurance under the laws of the Commonwealth of Massachusetts as a licensed foreign insurer and is doing business in the Commonwealth of Massachusetts. Hartford is a subsidiary of the Hartford Fire Insurance Company ("Hartford Fire") a wholly owned subsidiary of The Hartford Financial Services Group, Inc. Hartford Fire employs the individuals deciding claims under insurance policies issued by Hartford.

3.      Defendant is Group Long Term Disability Plan for employees of ORACLE AMERICA, INC. ("Plan") of 500 Oracle Parkway, Redwood City, San Mateo County, California, at the time this claim arose. Oracle America, Inc., is a subsidiary of Oracle Corporation which is a Delaware corporation headquartered in Austin, Texas. Oracle America, Inc. was the ERISA statutory Plan Administrator under ERISA.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction for claims for benefits arising under 29 U.S.C. § 1132(a)(1)(B).

5.      Venue is proper before this Court, because all defendants are engaged in the either the insurance business in this Commonwealth or are otherwise engaged in business in this Commonwealth and the plaintiff lives in the Commonwealth of Massachusetts in the eastern division of this Judicial District.

## FACTS COMMON TO ALL COUNTS

### Background Information on Santilli and the Plan

6. Oracle America, Inc., ("Oracle") employed Santilli in sales.

7. At all relevant times, Santilli was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7), in the Plan.

8. At all relevant times, the Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

9. At all relevant times, Hartford made all claims determinations under the Plan.

10. The benefits under the Plan are funded and insured under Policy Number: GLT395175 issued by Hartford.

11. The Certificate provided to Mr. Santilli states, "The Plan Described in this Booklet is Insured by the Hartford Life and Accident Insurance Company."

12. While covered under the Plan, Santilli suffered several injuries that resulted in symptoms preventing him from working in his sales position at Oracle.

13. Mr. Santilli has been under the care of physicians, chiropractors and physical therapists.

14. Mr. Santilli has been rendered disabled under the terms of the Plan, because of a combination of chronic pain and limited mobility due to seriously impairing medical caused by years of playing hockey and several car crashes.

15. Mr. Santilli has been evaluated by physicians at the Cantu Center; Centeno Schultz Clinic of Colorado; the Massachusetts General Hospital Spine Clinic; New England Spine Care; South Shore Hospital and other medical facilities.

16. Mr. Santilli left work, because the symptoms of his injuries prevented him from fulfilling his occupational duties.

17. Mr. Santilli applied for employer sponsored short-term disability benefits and received the benefits under the short-term benefit plan.

18. Mr. Santilli applied for long-term disability benefits ("LTD benefits) under the Plan which Hartford refused to pay.

19. After exhausting appeals, Mr. Santilli filed suit in a matter known as *Santilli v. Hartford Life and Accident Insurance Company Group Long Term Disability Plan for employees of ORACLE AMERICA, INC.*, Case No. 22-cv-10060-PBS ("First Suit").

20. The First Suit was resolved by a stipulated order of remand to the defendants dated August 29, 2022. Doc. No. 22 ("It is hereby ORDERED that this action is hereby REMANDED for Administrative Review upon agreement of the parties).

21. By letter dated August 31, 2022, Hartford overturned its prior adverse-benefit determination.

22. Hartford caused LTD benefits to be paid to Mr. Santilli retroactively from October 14, 2019 through April 30, 2022.

23. To prepare for each appeal, Mr. Santilli sought from Hartford documents required to be disclosed under the Department of Labor ERISA claims regulations.

24. Mr. Santilli wrote to Hartford no less than eight times requesting in accordance with 29 USC §1024(b), (c) and §1132(c) and the accompanying Secretary of Labor regulations and the last time on November 13, 2023 requesting again:

1. The document(s) which grants any authority from the plan sponsor or plan administrator to Hartford (if it claims discretion) to make decisions as a plan fiduciary as that term is defined under 29 USC §1105( c) under the long-term disability plan.

2. All relevant documents regarding the operation of the short term plan and long term plan as defined under 29 C.F.R. § 2560.503-1(m)(8), which either plan:
a. relied on in making benefit determination;
b. submitted, considered or generated in the course of making benefit determination, regardless of whether relied on;
c. demonstrates compliance with administrative procedures in making benefit determination in accordance with plan documents; and
d. in case of group health or disability benefits, constitutes a statement of policy with concerning the denied treatment, regardless of whether relied on in making benefit determination.

3.  Be sure to include emails, Instant Messages, Slack communications and similar documents whereby employees communicate regarding the claim. Your email dated March 24, 2023, does not address my request for email, IMs, Slack, Teams and other similar communications regarding Mr. Santilli's claim. Also, include the Hartford claims guidelines which have not been produced to date.

25.   Hartford failed to provide responsive documents to 1 – 3 in the above paragraph and hampered Mr. Santilli's ability to fully and to fairly secure review under ERISA.

26.   Mr. Santilli filed several appeals to Hartford and to the Plan contesting the termination date of April 30, 2022.

27.   Mr. Santilli provided Hartford with medical support from his treating physicians and other health care providers, explaining he could not work in any occupation.

28.   Mr. Santilli provided to Hartford an independent medical report by David Hurtado, M.D., a board-certified physical medicine and rehabilitation physician who examined Mr. Santilli and reviewed medical records who concluded he is not able to return to work.

29.   Mr. Santilli filed several appeals to Hartford and to the Plan explaining that defendants should have paid him LTD benefits in the amount of $8,270 per month rather than $3,335 per month paid by the defendants.

30.   Even when appealed, Oracle took the position that it was too bothersome to carefully examine Mr. Santilli's compensation for the purpose of determining LTD benefits.

31.   On September 27, 2022, Diana Chan, an Oracle employee wrote to another Oracle employee, Julie Berryhill:

| From: | Diana S. Chan |
|---|---|
| To: | Julie Berryhill |
| Subject: | RE: [External] : Joe Santilli - Oracle employee - LTD Claim |
| Date: | Tuesday, September 27, 2022 10:21:00 AM |
| Attachments: | image001.png |

Hi Julie,

Please review/edit my response back to Hartford to respond back to his attorney's questions.

For LTD benefits, the process is:

Every week, the LTD Analyst from the Hartford sends a list of employees to Rod Spears, Sr. Benefits Specialist (Julie – responsibilities can change and I'm wondering if it would be best to say Benefits_us@oracle.com instead of providing Rod's name) that have applied for LTD.

The list from the Hartford includes:

- EEID
- Name
- Year/Date of disability
- Taxable determination – looking back 3 years
- Monthly LTD benefit amount obtained from WTW's system.

The LTD Benefit amount in WTW's system is a frozen dollar amount obtain from the Benefits Salary used during open enrollment for Jan 1st, the next calendar year's benefits.

The Benefits Salary is defined as base salary as of 10/1 plus performance pay from the prior year. **For example for 2022:** Base salary as of 10/1/2021, plus performance pay from October 1, 2020 through September 30, 2021. Of note, Oracle's focal reviews are done in September. Therefore, generally, the employee's latest base salary is captured for the Benefits Salary. If an employee questions their Benefits Salary, Benefits would review the calculation and double check latest base salary preceding date of disability to reconfirm the monthly LTD benefits amount previously provided or provide an updated LTD benefits monthly amount back to Hartford.

Julie – on average, we receive at least 10-15 LTD requests from the Hartford every week and for us to manually sift through each employee's statement of earnings looking back several pay periods would be a time sink and would cause delays in getting the information back to Hartford. Hence, we defer to the LTD benefits amount posted in WTW's system.

Thanks,

Diana

6

## HARTFORD RELIED ON NON-EXAMINING PHYSICIANS WHO ARE NOT

## LICENSED TO PRACTICE IN THIS COMMONWEALTH

26. In rendering more adverse-benefit determinations, Hartford relied on the opinion of non-examining physicians Sameer Jain, M.D., of Little Rock, Arkansas and Michael Chen, M.D. of Los Angeles, California who is also known as Dr. Michael Li Ho Chen.

27. When Hartford had rendered adverse-benefit determinations before the First Suit, it had relied on the medical opinions of non-examining physician Louis Y. Banks, M.D., who was not licensed to practice medicine in the Commonwealth of Massachusetts.

28. Not a single physician relied on by Hartford (Drs. Banks, Chen or Jain) is licensed to practice medicine in the Commonwealth of Massachusetts.

29. Hartford directs its claim personnel to schedule claimants, such as Santilli, for an Independent Medical Examination rather than a file review, because Hartford's non-examining consultants disagreed with Santilli's medical healthcare providers. This policy is set forth in the attached EXHIBIT A.

30. Massachusetts G.L. c. 112, § 2 prescribes requirements for physician licensing in the Commonwealth of Massachusetts.

31. Under the 243 Code of Massachusetts Regulations 2.01

**The Practice of Medicine** means the following conduct, the purpose or reasonably foreseeable effect of which is to encourage the reliance of another person upon an individual's knowledge or skill in the maintenance of human health by the prevention, alleviation, or cure of disease, and involving or reasonably thought to involve an assumption of responsibility for the other person's physical or mental well being: diagnosis, treatment, use of instruments or other devices, or the prescribing, administering, dispensing or distributing of drugs for the relief of diseases or adverse physical or mental conditions.
(b) The Practice of Medicine includes the following:
1. Telemedicine, as defined in 243 CMR 2.01: Telemedicine; and
2. **Providing an independent medical examination or a disability evaluation**.

32. As a fiduciary, Hartford should not have assisted three unlicensed physicians from practicing medicine without a license in the Commonwealth of Massachusetts.

7

33. Hartford could have had Santilli examined by a physician in Massachusetts but elected not to comply with the law or act like a disinterested fiduciary.

34. In response to an inquiry by Santilli' counsel, in a written opinion dated January 11, 2019, the general counsel's office for the Massachusetts Board of Registration in Medicine determined that physicians offering a diagnosis or disability evaluation require Massachusetts licensure from the Board of Registration of Medicine because either offering medical diagnosis or offering a disability opinion constitutes practicing medicine in this Commonwealth. A copy of the opinion is attached as EXHIBIT B.

35. In addition prior to the First Suit, Hartford relied on the opinion of a non-examining psychologist, Nick A. DeFilippis, Ph.D., who is not licensed to practice psychology in the Commonwealth of Massachusetts.

36. Dr. DeFilippis has a documented history of serving insurance companies and rendering opinions without conducting an examination of the plan participant.

37. During the subsequent appeals, Hartford relied on Charles Golden, Ph.D., who is not licensed to practice psychology in the Commonwealth of Massachusetts.

38. As a fiduciary, Hartford should not have assisted Dr. DeFilippis and Dr. Golden from practicing psychology in the Commonwealth of Massachusetts without being licensed.

### CLAIMS HANDLING PROCESS BY HARTFORD

39. In November 2012, Hartford began "segmenting" incoming LTD claims based on their complexity. When an LTD claim is first made, Hartford uses a computer tool to predict, based on information provided in the initial application, how complex the claim will be to handle. The purpose of segmenting claims is to ensure that employees handle the proper complexity of claims based on their experience-level and capabilities.

40. LTD Segmentation — Segmentation Overview Continued is set forth on the attached EXHIBIT C.

41. The least complex claims (for example, claims involving obviously disabling

8

conditions and predictable return to work dates), are designated "Segment I" claims and assigned to employees who are overtime eligible. A claim for benefits by an individual with a broken leg is an example of a claim normally designated as Segment I. See attached EXHIBIT D.

42.  Claims that involve less obviously disabling conditions and/or uncertainty about whether and when an individual can return to work are designated Segment II or Segment III claims. If they involve "mental/nervous" conditions (for example, depression or fibromyalgia), or exceptionally high-earning claimants, they are usually designated Segment III claims. Otherwise, they are designated Segment II claims. A claim by an individual with a back or heart condition, with an uncertain prognosis, for example, would typically be a Segment II claim. See attached EXHIBIT E.

43. Hartford measures accountability through a Claim Quality Index score.  The Claim Quality Index score allows Hartford to view trends, provide immediate feedback, and revise/create standards.  Rating factors used to determine Claim Quality Index are accuracy, efficiency, timeliness and customer service. See attached EXHIBIT D

44. The Hartford measures the accuracy and timeliness of a Segment II analyst's claims adjudication using numerical Claims Quality Index or "CQI" scores. See attached EXHIBIT D.

45. A Segment II analyst cannot obtain strong CQI scores without developing a claim management plan for each claim and adapting the plan as new information is received. See attached EXHIBIT D.

46. Segment III claims often involve "mental/nervous" conditions or other conditions with symptoms that are hard to verify or that have widely varying effects on an individual's ability to work. See attached EXHIBIT E.

47. Team Leaders must sign off on the claims of employees on their teams in certain situations, for example, when a team member determines that Hartford should deny or discontinue

benefits, that a newly insured claimant does not have a pre-existing condition, or that The Hartford should pay a claim in an amount that exceeds the employee's authority.

48. The amount that each claims-handling employee may approve ranges in various monthly payments. Typically Segment III claims analysts may approve on their own payments of up to $6000 per month. Typically Segment II analysts may approve up to $5000 per month. Other analysts are limited to $2500 per month. See attached EXHIBIT D.

49. Certain Segment II and Segment III analysts, sometimes called "lump -sum settlement coordinators" or "LSS coordinators" may present the option of a lump sum settlement to claimants and, when claimants are interested in a lump sum settlement, negotiate the amount. The Hartford sets a minimum and maximum range for a lump sum settlement, but within the range, a lump sum settlement coordinator has authority to negotiate with the claimant the amount that will be paid. See attached EXHIBIT D.

50. Team Leaders focus their attention on employees who are inexperienced or have lower quality work, to make sure they are developing their skills and improving their performance. The more proficient employees receive substantially less supervision. For example, Team Leaders typically spend less time reviewing the work of employees who handle Segment III claims, as they are typically the most experienced and proficient LTD employees. See attached EXHIBIT D.

51. CAR teams handle claims that have gone through "test change." Under many LTD policies, the test for determining a claimant's eligibility changes after the claimant has been receiving benefits for 24 months, or a different period of time, as defined in the policy. Until that time, the claimant's eligibility for benefits typically depends on his or her inability to work in his or her "own occupation." When a claim approved for payment approaches the 24-month mark or other time period in the policy, LTD employees determine whether benefits will continue after the test changes from "own occupation" to "any occupation." This

determination is often called the "test-change" determination. If a claimant is approved to continue to receive benefits after the 24-month "test change," the claim is typically re-assigned to a CAR team. See attached EXHIBIT D.

52. CAR analysts do not make the often-urgent initial decision to approve a claim. Rather, they periodically assess whether the circumstances of an already-approved claim have changed in a relevant way. Handling CAR claims requires different skills than handling LTD claims.

53. Medical Case Managers ("MCMs") and Behavioral Health Case Managers ("BHCMs"), and Rehabilitation Case Managers ("RCMs") serve as resources to employees handling LTD claims. See attached EXHIBIT F.

54. MCMs provide guidance about whether a claimant's stated restrictions and limitations are supported by information from a health care provider or other medical records. See attached EXHIBIT F.

55. BHCMs provide similar guidance when a claimant's stated restrictions and limitations relate to a behavioral health condition. See attached EXHIBIT F.

56. RCMs provide guidance about the demands of a claimant's job based on his or her job description. They also assist with, among other duties, comparing a claimant's restrictions and limitations to jobs in the national economy. See attached EXHIBIT F.

57. MCMs and BHCMs are considered Clinical Case Managers ("CCMs"). See attached EXHIBIT F.

58. Analysts may formally refer a claim to a CCM by submitting in writing a synopsis of the claim, a plan for the claim, and clear and concise questions for the CCM. Alternatively, an analyst may make a "hotline call," a brief call to a nurse for advice. The response time to a formal referral varies based on demand, but it typically takes a week or longer. Hotline calls are answered immediately.

59. A job aid in Hartford's "Claims Excellence" online library of tools and information addresses issues.

60. Several Hartford Fire employees make-up the LTD Best Practices team.

61. They prepare The Hartford's online library of tools and information about LTD claims and answering questions from LTD employees.

62. The materials are stored on sites known as "Claims Excellence" and, since November 2015, "KMT". They are available to all employees through The Hartford's intranet. Before 2011, similar materials were available through an online claim manual.

63. The Claims Excellence materials include "standards," "job aids," and other tools that employees may use to gather information during calls with claimants.

64. Claims Excellence is a vast resource, containing hundreds of links to documents.

65. Hartford tracks claims by diagnostic drivers (claim counts, % of total claims, and cost of claims related to each diagnostic category).

66. Hartford measures ROI for each client account. "[F]or STD and LTD ROI calculations, we may take the employer's data, analyze them to determine which specific diagnostic groupings might yield the greatest potential for ROI savings, and suggest and track methods to capture those savings." See attached EXHIBIT G.

67. Hartford provides many reports to employers, including reports where the Hartford tracks the # of claims incurred each month, the # of claims with payments, and the total benefits incurred and paid. The Hartford also provides yearly claim counts by diagnosis, loss unit, length of service, and salary level. See attached EXHIBIT H.

**HARTFORD AND ORACLE ENGAGED IN BIAS CLAIMS HANDLING FROM THE OUTSET WHEN CONSIDERING MR. SANTILLI'S CLAIM**

68. Hartford engaged in conduct unbecoming of a fiduciary from the outset of Mr. Santilli's claim.

69. An internal email dated May 12, 2020 discloses that Hartford was scheming with Oracle to deprive Mr. Santilli from receiving LTD benefits almost from the inception of his claim.

70. Kelly Grimes, a claims manager at Hartford wrote to Diana Chan, the Leave and Disability Manager at Oracle as follows:



**From:** Grimes, Kelly K (GB and WC Claims) <kelly.grimes@thehartford.com>
**Sent:** Tuesday, May 12, 2020 7:07 PM
**To:** Diana S. Chan <diana.chan@oracle.com>; Kristine Cutshaw <kristine.cutshaw@oracle.com>
**Subject:** RE: Joseph Santilli--Escalation [CONFIDENTIAL]

That's exactly what we are reviewing again now that we have a few more records. Early on there wasn't enough to render any sort of decision, but we are hoping there is enough now to have a solid denial so we can provide appeal language for that reason. If appealed and overturned, there would still be pre-ex outstanding (if those records aren't retuned on appeal).

I should know more in 1-2 days after our phone contacts with the physician and another full claim review.

**Kelly Grimes**
Manager, Claim Customer Support
Commercial Markets – Group Benefit Claims

The Hartford Financial Services Group, Inc.
W: 952-656-6691
F: 860-392-1410

71. This email discloses that Hartford engaged in a multi-step process in evaluating Mr. Santilli's claim for benefits.

72. Hartford elected not to raise a pre-existing condition issue if Mr. Santilli appealed Hartford's and Oracle's initial denial so there would be another ground to contest Mr. Santilli's eligibility.

73. A neutral fiduciary would not engage in a scheme to serially deny ERISA welfare-benefits at the expense of the plan participant.

74. Oracle failed to instruct Hartford to act like a true fiduciary and not a fiduciary that places its financial interests ahead of the participant's interests, or at least on equal footing as is required by insurance standards of care

**FIRST CAUSE OF ACTION**

**BENEFITS DUE FROM ALL DEFENDANTS**
**UNDER ERISA, 29 U.S.C. § 1132(a)(1)(B)**

75. Plaintiff incorporates those allegations in the prior paragraphs as though set forth at length herein.

76. Before suing Santilli administratively exhausted each internal appeal required under the Plan.

77. This Court must conduct a plenary proceeding in evaluating Hartford's decision to terminate benefits.

78. Santilli has a certificate rather than the insurance policy and according to the certificate, the certificate is part of the group policy.

79. The certificate does not have a provision addressing conflict of laws.

80. The insurance policy, Plan and certificate are governed under the law of either the State of California or State of Texas.

81. Both the State of Texas and State of California prohibit discretion clauses in insured plans governed under ERISA.

82. Pursuant to California Insurance Code 10110.6 any reservation of discretion in the plan, insurance policy or any plan document is null, void, and unenforceable.

83. Texas bans discretionary clauses from any "forms." Tex. Admin. Code § 3.1203. A "form" includes any (a) policy, (b) contract, (c) certificate, (d) application attached or required to be attached to a policy, contract or certificate, or (e) rider or endorsement attached or used in connection with the policy contract, or certificate. Tex. Ins. Code § 1701.002. The Texas ban on discretionary clauses sets forth the specific circumstances in which it applies as follows:

(b) Except as specified in subsections (c) and (d) of this section, this subchapter applies to forms offered, issued, renewed, or delivered on or after June 1, 2011, including forms that include premium waiver provisions based on upon a disability determination.

14

(c) For forms that include disability income protection coverage providing for period payments during disability due to sickness and/or accident, whether provided through a policy, certificate, or rider, this subchapter applies to forms offered, issued, renewed, or delivered on or after February 1, 2011.

(d) For forms issued or delivered prior to the effective date of this subchapter that do not contain a renewal date, this subchapter applies on or after the effective date of any rate increase applicable to the form or any change, modification, or amendment of the form occurring on or after June 1, 2011.

28 Tex. Adm. Code § 3.1201.E

84. Any reservation of discretion in the insurance policy or the plan, or any plan document, is null, void, invalid and unenforceable.

85. The decision to refuse to pay benefits to Santilli was wrongful and not in compliance with laws.

86. Hartford has financial conflicts of interest regarding handling, monitoring and eventually denying plaintiff's disability benefits.

87. A "higher than marketplace" quality standard, as set forth in Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008), applies to evaluating the actions of Hartford. Hartford had to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

88. Hartford violated the higher-than-marketplace standards that ERISA imposes on insurers by conduct including but not limited to:

a) Refusing to pay benefit payments to plaintiff at a time when Hartford knew that he was entitled to benefits under the terms of the Plan.

b) Disregarding plaintiff's treating physicians' assessment of plaintiff's medical condition and how it restricts and limits him from performing his own and any occupation with no basis.

c) Selectively highlighting certain factors in medical reports to cast a favorable light on its position while ignoring the conclusions of plaintiff's treating physicians regarding the conditions for which they render treatment.

d)      Disregarding plaintiff's own assessment of his medical condition and how it restricts and limits him from performing any occupation.

e)      Engaging in a pattern of procedural irregularities to advance its own financial interests in refusing to pay benefits, to the detriment of Plan participants, and particularly here by failing to secure copies of medical records, and then arbitrarily closing the claim record knowing more records would be forthcoming.

f)      Improperly refusing to provide information relevant to the denial determination, which it had to provide under 29 C.F.R. § 2560.503(g), in violation of ERISA, including emails and IM messaging which Hartford has in its possession, custody and control.

g)      Failing to maintain and utilize "reasonable claims procedures" as it had to do under 29 CFR § 2560.503-1(b), in violation of ERISA.

h)      Failing to ensure that Santilli's claim and his appeal for disability benefits were adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision, as Hartford was obligated to do pursuant to 29 C.F.R. §2560.503-1(b)(7).

i)      Assisting in the unlicensed practice of medicine in the Commonwealth of Massachusetts.

i)      Consistently acting in its own personal interests instead of those of the Plan and its participants.

89. Hartford breached its fiduciary duty by failing to fairly review and reasonably interpret the reports prepared by plaintiff's treating and examining physicians and failed to fairly consider material relevant to his medical condition.

90. Defendants underpaid Santilli monthly disability benefits as it should have paid him LTD benefits in the amount of $8,270 per month rather than $3,335 per month.

91. Because of Hartford's refusal and failure to pay to Santilli disability benefits provided to him, Santilli may have relief against Hartford to recover benefits due to him under the Plan and to enforce his rights to benefits under the Plan and to clarify his rights to future benefits under the Plan under 29 U.S.C. § 1132 (a).

## SECOND CAUSE OF ACTION

## FIDUCIARY BREACH UNDER 29 U.S.C. § 1132(a)(3)

**Hartford Encourages the Unlicensed Practice of Medicine of Massachusetts Citizens.**

92. Plaintiff incorporates those allegations in the prior paragraphs as though set forth at length herein.

93. Hartford is a fiduciary within the meaning of 29 U.S.C. §1002(21)(A) because it is a named fiduciary, and exercised authority or control over management and disposition of assets of the LTD Plan and decided not to pay benefits to participants.

94. Hartford breached its fiduciary duties by retaining unlicensed Massachusetts physicians, either directly or through an agent, to render disability opinions regarding Santilli despite knowing that this conduct violated Massachusetts law regarding the practice medicine.

95. The above-described breach is not an isolated incident but a practice of Hartford for years to rely on physicians who are not licensed in this Commonwealth to render disability opinions regarding plan participants in Massachusetts.

96. Hartford's continuing election to rely on unlicensed Massachusetts physicians to render disability opinions regarding Massachusetts residents is a fiduciary breach under ERISA.

97. ERISA does not preempt the Commonwealth of Massachusetts ability to regulate the practice of medicine.

98. Santilli is entitled to seek on his behalf and for others similarly situated an order barring Hartford from continuing to assist in the unlicensed practice of medicine in the Commonwealth of Massachusetts.

## THRID CAUSE OF ACTION

### AWARD OF ATTORNEYS' FEES AND COSTS UNDER 29 U.S.C. § 1132 (g)

99. Plaintiff incorporates those allegations in the prior paragraphs as though set forth at length herein.

100. Hartford unlawfully refused to pay benefits to Santilli and has caused Santilli to incur attorneys' fees and costs and will cause him to incur additional fees and costs.

101. Santilli may recover under 29 U.S.C. § 1132 (g), costs, including reasonable attorneys' fees and interest at the Massachusetts statutory rate of 12% simple interest per annum on all back due benefits.

**WHEREFORE**, plaintiff demands relief and judgment against all defendants, jointly and severally,

A.   For a sum of money to be determined by this Court, plus pre-judgment interest (at no less than the Massachusetts statutory rate of 12%), post-judgment interest, costs and reasonable attorney's fees allowed by statute or otherwise under 29 U.S.C. § 1132(a)(1)(B) and (g)(1).

B.   Injunctive relief declaring the rights and duties of the plaintiff and defendants regarding past benefits owed to the plaintiff, and future benefits to be paid to the plaintiff under 29 U.S.C. § 1132(a)(1)(B).

C.  An equitable order barring Hartford Life and Accident Insurance Company from using physicians not licensed in the Commonwealth of Massachusetts to render disability opinions regarding citizens of this Commonwealth under 29 U.S.C. § 1132(a)(3).

D. In the alternative, remanding the benefit denial to defendant to be decided again with an order requiring "full and fair review" under ERISA, 29 U.S.C. §1133(2).

18

E. For such other legal or equitable relief as this Court deems just and proper.

JOSEPH L. SANTILLI

By his attorney,

*/s/ Jonathan M. Feigenbaum*

Jonathan M. Feigenbaum, Esq.
B.B.O. N#546686
184 Hight Street
Boston, MA 02110
Tel. No.: (617) 357-9700
Fax. No.: (617) 227-2843
jonathan@erisaattorneys.com